UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

**ELECTRONICALLY FILED**

UNITED STATES OF AMERICA                    PLAINTIFF

v.              CRIMINAL ACTION NO. 3:24-CR-00017-MPB-CSW

AARON PAUL LOCKMAN                          DEFENDANT

## AARON LOCKMAN'S SENTENCING MEMORANDUM

A district judge once proposed that "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006). Defendant Aaron Lockman has pleaded guilty to possessing child pornography, an offense for which the Sentencing Guidelines recommend a penalty of 78 to 97 months in prison (Presentence Rep., R. 36 pg. 14 ¶ 80, Page ID # 160); it is thus a grave act of misconduct that the Court must assess "in the context of [Aaron's] overall life hitherto." As Aaron's friends and family attest in their letters of support, however, there is much good that Aaron has done in his life, and when placed in

the scales against his crime, the balance favors a penalty much less severe than the one endorsed by the Guidelines.

"Aaron [is] a person of great faith, integrity, compassion and responsibility," writes his aunt Deanna. (Letters of Support, R. 40-3 pg. 29, Page ID # 228.) "Whether volunteering for church missions, local community and school events or lending a helping hand to family members and emotional support to friends in time of need, celebration or loss," she writes, "Aaron's selflessness and generosity consistently stand out." (*Ibid.*) A friend describes Aaron as "one of the most caring individuals I know. Whenever someone was struggling, he was the first to step in – listening without judgment, offering emotional support, and helping them work through their problems." (*Id.* at pg. 34, Page ID # 233.) "He has a genuine empathy and desire to help others that has always stood out to me," the friend adds. (*Ibid.*) When he was a promising young baseball player, writes his mother, Aaron stayed late at practice, but not just to improve his own skills: "many times [he did] so to make sure his fellow teammates were receiving extra help as well." (*Id.* at pg. 8, Page ID # 207.)

Aaron's sister Isabella says that "Aaron is my best friend who also happened to be my brother." (Letters of Support, R. 40-3 pg. 1, Page ID # 200.) Aaron demonstrated his strength of character most profoundly when Isabella was diagnosed with a serious, incurable illness:

> Aaron showed compassion through faith.  He was
> understanding and patient with me when I was mad,
> lost, and hopeless.  Aaron has never been a
> judgmental person; he listened to me throughout my
> struggles.  My mental health had tanked, and my
> marriage had failed, but Aaron never made me feel
> alone.  He showed up physically and mentally for me
> when I needed him the most.

(*Id.* at pg. 2.)  "He helped me find my feet again, my faith again and
my courage to keep going," Isabella affirms.  (*Ibid.*)  Aaron was
similarly supportive of the close friends in his youth group.  "Aaron
was always kind," writes Daniel Oberdieck, one of the group
members: "He was the first to offer his home to host us for
gatherings.  He was the first to admit when he was wrong.  He was
the first to offer a heartfelt word of encouragement when any one of
us was going through a hard time."  (*Id.* at pg. 18, Page ID # 217.)
"[H]e genuinely wanted to be *good*," Daniel recalls: "He wanted to
serve his friends and his neighbors.  He wanted to serve his Lord."
(*Ibid.* (emphasis in original).)

Aaron's qualities of character have routinely impressed his
employers and co-workers.  "I have known Aaron since 2021, when
we first met through ministry work," writes Tonya Truong. (Letters
of Support, R. 40-3 pg. 15, Page ID # 214.)  "Aaron quickly became
one of the most dependable and compassionate members of our
team," she writes, and "[h]e had a gift for making others feel like
family."  (*Ibid.*)  "His leadership extended beyond our local

community," Tonya continues, as when he went to Eastern Kentucky to help plant a church in an impoverished area, and also traveled to Guatemala, "where he helped build homes for families in need." (*Ibid.*) "His dedication was sincere and selfless," Tonya attests: "That is the kind of person Aaron has always been – someone who thinks first of others." (*Ibid.*) Aaron has proved himself equally adept in his current role as assistant operations manager for Marsden Services in Louisville, a company Aaron joined in January 2025. (*See* Presentence Rep., R. 36 pg. 12 ¶ 67, Page ID # 158.) His supervisor, Tieria Wright, says that Aaron's "consistent dedication and strong leadership" brought him several quick promotions and made him overseer of the entire night shift operation, where "he manages all night shift staffing, scheduling, and production, as well as four supervisors, two crew chiefs, and more than 200 associates." (Letters of Support, R. 40-3 pg. 4, Page ID # 203.) "From day one, Aaron has demonstrated reliability, integrity, and a tireless work ethic," Tieria comments. (*Id.* at pg. 5, Page ID # 204.) "His commitment to the team is unwavering," she continues: "He takes genuine interest in his team's well-being—not only encouraging them to improve in their work but also taking the time to learn about their lives. He celebrates their successes with team lunches and is a steady, positive presence in the workplace." (*Ibid.*) "He has grown into a leader who can make tough calls while maintaining the trust and morale of his team," and "consistently

demonstrates honesty and ownership.  When problems arise, he is the first to step forward, take responsibility, and look for solutions." (*Ibid.*)

Until a short time ago, Aaron had engaged in all of these relationships with family, friends, and co-workers while harboring an awful secret from his childhood: he had been violently raped by a stranger in the school bathroom when he was just eight years old.  Aaron gives a harrowing account of the attack in his personal statement.  (Personal Statement, R. 40-2 pp. 2-3, Page ID # 186-187.)  "I was unsure what had just happened or how to even explain it," Aaron recalls.  (*Id.* at pg. 3, Page ID # 187.)  "For years," he writes, "I tried to push the memory away.  I didn't understand how deeply it had affected me – how it shaped the way I viewed myself, others, and the world around me." (*Ibid.*)  Counselors treating Aaron recently have determined that he was suffering from posttraumatic stress disorder, generalized anxiety disorder, and major depressive disorder during these years.  (Presentence Rep., R. 36 pp. 10-11 ¶¶ 56-57, Page ID # 156-157.)  With the benefit of insight gained through psychological therapy, Aaron explains that "trauma left untreated can quietly distort a person's sense of safety, trust, self-worth, and creates the potential for maladaptive behaviors that try to help make the pain disappear without actually healing the correct way." (Personal Statement, R. 40-2 pg. 3, Page ID # 187.)  Aaron thus understands now that, when he

first looked at child pornography at age fifteen, "my brain began to create a perception that if I continue to view these, I will begin to heal as I know I am not alone." (*Id.* at pg. 4, Page ID # 188.) "I was desperate for some sort of answer," he writes, "desperate for something or someone to tell me that I was not alone. Viewing these files began creating maladaptive sexual thoughts and due to this being the incorrect way to process and/or grieve my childhood, it began to create a false sense of security." (*Ibid.*)

Specialists have noted an association between childhood sexual trauma and later addictive use of pornography. Studies indicate that "[a]ddictive sexual activities have … been linked to a history of trauma and posttraumatic stress disorder," and "[p]roblematic use of pornography is often associated with … depression and anxiety … and can reflect a potentially maladaptive emotion-regulation strategy (i.e., to reduce aversive thoughts, feelings, or sensations…)." Aline Wéry, Adriano Schimmenti, Laurent Karila & Joel Billieux, *Where the Mind Cannot Dare: A Case of Addictive Use of Online Pornography and Its Relationship With Childhood Trauma*, 45 J. of Sex & Marital Therapy 114, 115, 117 (2019).[1] Scholars believe that "the addictive use of online

---

[1]    Available online at https://www.researchgate.net/publication/326456771_Where_the_Mind_Cannot_Dare_A_Case_of_Addictive_Use_of_Online_Pornography_and_Its_Relationship_With_Childhood_Trauma#read.

pornography may represent a maladaptive coping strategy for unprocessed relational trauma, feelings of loneliness and isolation, and/or negative beliefs about self and others." *Id.* at 123. A similar concept, "trauma theory," takes note of "the high frequency of sexual victimization in the history of individuals who later became sexually compulsive" and "views sexual compulsivity as an aspect of some post-traumatic-stress and dissociative disorders." John Giugliano, *Out of Control Sexual Behavior: A Qualitative Investigation*, 13 Sexual Addiction & Compulsivity 361, 362 (2006) (citing study).[2]

Fortunately, Aaron's involvement with child pornography in his teenage years was discovered by law enforcement authorities; sadly, the counseling Aaron received at the time fell short of what he needed to overcome his sexual trauma and his maladaptive pornography use. Aaron took the important step of disclosing his sexual assault victimization: "I spoke openly about it" to investigators, probation officers, and mental health therapists, he recalls, "and [I] asked for help processing it." (Personal Statement, R. 40-2 pg. 4, Page ID # 188.) In Aaron's experience, though, the focus of the justice system at the time was on obedience to the strictures of probationary supervision and satisfaction of

---

[2]    Available at https://www.researchgate.net/ publication/247501754_Out_of_Control_Sexual_Behavior_A_Qualit ative_Investigation.

prescribed legal benchmarks rather than remedying his underlying damage – "The focus was on compliance, not healing," as Aaron puts it.  (*Ibid.*)  He does not doubt that the authorities had his and the community's best interests in mind when they sought to rehabilitate him, but he regrets that "the distorted thinking I've since worked to correct might have been resolved years earlier." (*Id.* at pp. 4-5, Page ID # 188-189.)

In his late teens and early twenties, Aaron successfully maintained a series of jobs and steadily pursued higher education. He has been employed almost continuously since age eighteen, when he started his first job ever, a position at Chick-Fil-A.  (*See* Presentence Rep., R. 36 pp. 12-13, ¶¶ 67-73, Page ID # 158-159.) "I learned valuable lessons" at Chick-Fil-A "about leadership, teamwork, and accountability," Aaron recalls, "and [I] began developing skills that would later shape my professional life." (Personal Statement, R. 40-2 pg. 6, Page ID # 190.)  Aaron has been taking college classes almost non-stop through the same period, including ongoing enrollment in Ivy Tech and long term online studies toward a degree in ministry leadership with Lee University.  (Presentence Rep., R. 36 pg. 12, ¶¶ 64-65, Page ID # 158.)  "Aaron has always implemented 110% of hard work ethics and has a 'no quit' attitude in life," praises his father.  (Letters of Support, R. 40-3 pg. 22, Page ID # 221.)  "His commitment to his faith, his strong work ethic, and his desire to continue his

education all reflect a man striving to grow and rebuild his life in the right way," contributes Aaron's friend, Dalton Mouser. (*Id.* at pg. 35, Page ID # 234.)

Aaron managed to stay on course despite several grievous personal losses during his late teens and early twenties. Automobile accidents claimed the lives of two of Aaron's closest friends in a twelve month period in 2018-2019, and Aaron's grandmother died in 2020 after a battle with Alzheimer's Disease. (Personal Statement, R. 40-2 pp. 5-6, Page ID # 189-190.) "I treated these experiences similar to the way I treated the past trauma in my life," Aaron writes: "I did not have the correct tools to grieve properly, so instead of grieving, processing, or thinking about it, I pushed all of this pain and brokenness so far down that I became numb to any of it." (*Id.* at pg. 6, Page ID # 190.)

But Aaron's ability to cope began to erode in late 2022. His sister Isabella suffered severe setbacks in her personal life and physical health, and Aaron took a new job in Jasper, Indiana, a significant distance from where his family and friends lived. (Personal Statement, R. 40-2 pp. 6-7, Page ID # 190-191.) "I felt completely alone," Aaron remembers. (*Id.* at pg. 7, Page ID # 191.) "There wasn't really anyone I could talk to about any of this," he continues, and "I began feeling the guilt of my family dealing with all of these significant life events, all while I am living away from them and not really able to be part of their grieving process."

(*Ibid.*)  To makes things worse, "[a]ll of this loss and all of this pain brought all of my other past experiences back up: everything from my childhood sexual trauma, to the sexual offense, the deaths of two very close friends, my grandmother's passing, sister's medical and mental diagnoses, my sister's divorce, etc." (*Ibid.*)

"My life began getting into a dark, empty, meaningless place," Aaron attests. "Trauma from all of my life began holding me down.  There were days that I was not able to get out of bed.  There were days that all I wanted to do was cut everyone and everything off from my life as I thought that would solve my issues." (Personal Statement, R. 40-2 pg. 7, Page ID # 191.)  Aaron sought to fall back on his method of "push[ing] down all of this pain and hurt so far, to never be able to think of it again," but he could not find "something to numb me enough that I would never suffer these feelings and pain ever again." (*Ibid.*)

This led to catastrophe.  "One evening at the beginning of 2023," Aaron writes, "after having one of the worst days of my life, I was willing to do anything to numb my pain.  Unfortunately," he laments, "I chose something that I had chosen before: I pulled out my phone and began looking at the same child sex abuse material as I did before." (Personal Statement, R. 40-2 pg. 7, Page ID # 191.)  In so doing, he acknowledges, "I chose something that not only harmed myself but began to revictimize children who had been in the same situation as myself." (*Id.* at pg. 8, Page ID # 192.)

Law enforcement officers' detection of Aaron's wrongdoing marked the beginning of his road to recovery.  He cooperated with investigators immediately:

> The moment they began asking those questions, I was open and honest with them.  I answered all questions that they asked, I provided them with access to my devices, passwords, as well as permission to search my apartment, without a search warrant, to allow them to have full ability to investigate where they need to, etc.  I did not try to hide[,] as I was and am ready to begin the process of growing as a person and ensuring I have no further connection with another child being hurt.

(Personal Statement, R. 40-2 pg. 8, Page ID # 192.)  Beginning on that first day, Aaron declares, "I've committed myself fully to becoming a different person," a process that started with confessing his crime to his family and friends.  (*Ibid.*)  His mother confirms that "the day that FBI [agents] approached and questioned Aaron, he came home and told his immediate family, and later that evening went to his extended family's houses to tell them all what his offense was."  (Letters of Support, R. 40-3 pg. 9, Page ID # 208.)  Since then, "[m]any nights sitting on the couch talking to our family, he has been in tears over all the pain he has caused many people," but "[n]ot once in those conversations did he try to make an excuse for his actions and choices."  (*Ibid.*)  Aaron's former colleague in the ministry, Tonya Truong, has had a similar experience:

> When his current offense came to light, he reached out
> to me personally – before I heard it from anyone else.
> Since then, we've spoken often, and I have seen him
> take full responsibility for his actions.  He has
> expressed deep remorse, not for what he has lost, but
> for the pain he knows he has caused others.  I have
> seen him in tears many times, and I truly believe his
> regret is genuine.

(*Id.* at pg. 16, Page ID # 215.)  Indeed, Aaron's decision to plead guilty to the crime charged in this case can be appreciated as part of this redemption process.  "If it is true that confession is good for the soul," wrote one court, "it must be acknowledged that a free and honest admission of guilt is perhaps the first and largest step toward ultimate rehabilitation."  *United States v. Derrick*, 519 F.2d 1, 4 (6th Cir. 1975).  Defendants who "hav[e] demonstrated sincere remorse for their crime," wrote Judge Posner, "are less likely either to delay the course of justice or to engage in further criminal activity when they complete their sentence."  *United States v. Wells*, 154 F.3d 412, 413 (7th Cir. 1998).  It is "inaccurate," commented another court, to assume that remorse is "a characteristic that most defendants … exhibit at sentencing"; rather, "a defendant's degree of remorse at sentencing may be considered as a basis for downward variance under § 3553(a)…."  *United States v. Howe*, 543 F.3d 128, 138 (3rd Cir. 2008).

Aaron's progress toward conquering the risk of sliding back into pornography use is illustrated most dramatically in the

success he has achieved in counseling.   Aaron's therapist, Justin Campbell LMHC, affirms that, for eighteen months now, "Aaron has shown up consistently to his weekly appointments, participates, and puts in the work outside of sessions by bringing back and doing the assignments assigned." (Counseling Rep., R. 40-1 pg. 1, Page ID # 183.)  In this effort, continues Mr. Campbell, "Aaron has worked and processed through childhood sexual trauma, pornography addiction, grief, family relationship issues, and maladaptive thoughts and behaviors." (*Ibid.*)  Aaron has positioned himself for a crime-free future by learning "coping skills and techniques to help him manage stress and triggers," and "is on a positive and sustainable path toward personal growth and well-being." (*Ibid.*)  Mr. Campbell commends Aaron for having "been open and honest about his struggles," for "showing courage and determination" in his therapy, and for having "demonstrated an ability to put the right people and activities in place to support his continued success." (*Ibid.*)

Aaron is acutely conscious of the effect this counseling has had on his emotional and behavioral norms and the manner in which this therapy has prepared him to ward off any urge to resort to child pornography in the future.  "By working through my childhood sexual abuse, the shame attached to it, and the maladaptive coping patterns that developed from it," Aaron writes, "I've been able to separate who I am today from what happened to

me in the past." (Personal Statement, R. 40-2 pg. 9, Page ID # 193.) The rehabilitation process has "forced me to confront distorted beliefs, identify risk patterns, and replace them with healthy, accountable ways of thinking. Because of this, I have a clear understanding of the specific thoughts, emotions, and situations that once made me vulnerable to harmful decisions, and I now have step-by-step strategies to interrupt them immediately." (*Ibid.*) The "many different tools" he has acquired in counseling "allow me to grieve properly, see how the actions I choose affect other people, and redirect myself when maladaptive thoughts and behaviors come up." (*Id.* at pg. 10, Page ID # 194.) Putting these new tools to work, Aaron writes, has demonstrated that "I can maintain stability, self-control, and healthy decision-making in day-to-day life. The combination of trauma processing and personalized relapse-prevention strategies has created an internal framework that makes future offending behavior both unacceptable and preventable." (*Ibid.*)

The people around Aaron have witnessed his progress toward a healthy new way of life. "What stands out most is his determination to improve himself and live with integrity," his brother-in-law Nicholas proffers. (Letters of Support, R. 40-3 pg. 12, Page ID # 211.) "Aaron has taken proactive steps to address past trauma and emotional wounds," explains Nicholas: "He has been regularly meeting with a therapist, implementing

home Bible studies, and seeking guidance through conversations with others, including a pastor." (*Ibid.*) "I have seen firsthand how committed he is to healing, accountability, and lasting change," Nicholas affirms: "Rather than blaming others for past pain, Aaron has chosen to take full ownership of his actions and has shown extraordinary maturity and resilience in doing so." (*Ibid.*) Tonya Truong, Aaron's former coworker, has similarly perceived his commitment to the fullest possible improvement: "He has not only expressed remorse but has actively sought ways to grow, reflect, and ensure accountability moving forward," she writes. (*Id.* at pg. 16, Page ID # 215.) Aaron's friend Daniel Oberdieck captures the fundamental irony of Aaron's crime and its aftermath: "It is very good, not just for the general welfare of the people, but especially for Aaron, that he was discovered and caught in his sin." (*Id.* at pg. 18, Page ID # 217.)

Aaron's strong commitment to therapy and his success in the effort is a meaningful consideration for sentencing. "There is no question that consideration of post-conviction rehabilitation is permissible," observed the Seventh Circuit: "Post-conviction conduct often recasts the 'history and characteristics' of a defendant" by the time sentencing takes place. *United States v. Shoffner*, 942 F.3d 818, 823 (7th Cir. 2019) (citing *Pepper v. United States*, 562 U.S. 476, 490-491 (2011)). As another court explained, the sentencing process "require[s] a judge to consider

characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend," and "postoffense rehabilitation reflects that [the defendant] has fundamentally changed since his offense, poses a lesser risk to the community, and does not require incapacitation for too long."  *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007).

\* \* \* \* \*

The passage just quoted captures the essence of Aaron's situation and explains why a penalty lighter than the 78 month prison term recommended by the Guidelines will be "sufficient, but not greater than necessary" in Aaron's particular case to "comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation."  *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)). Critically, too, a downward variance to a shorter prison term will be fully in step with sentences imposed nationwide in cases like this one, and thus will not compromise the Court's duty under § 3553(a)(6) to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the average punishment meted out to defendants like Aaron is not the Guidelines' recommended term of 78 months, but 56 months.  The Judiciary Sentencing Information (JSIN) platform maintained by the Sentencing Commission reports that,

in the years 2020-2024, there were 750 defendants whose primary Guideline was U.S.S.G. § 2G2.2, whose final offense level was 28, and whose criminal history placed them in Category I, all identical to Aaron's Guideline profile.  (Attach. 1, JSIN Data, pg. 1; *cf*. Presentence Rep., R. 36 pg. 7 ¶ 25, pg. 8 ¶¶ 37, 41, Page ID # 153-154.)  The average length of prison sentences given to these defendants was 56 months; the median length was 59 months. (Attach. 1, pg. 1.)  The explanation for this regularity of downward variances may be the growing acknowledgment that, "[d]ue to advancements in technology, enhancements that were only intended to apply to the most serious child pornography offenses [are] routinely applied to most non-production child pornography offenders."  U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography Non-Production Offenses*, pg. 2 (June 2021).[3]  Aaron's Guideline calculation provides an apt illustration: the two-level enhancement for possessing images of prepubescent minors is added in 93% of comparable cases; the two-level increase for use of a computer occurs in 98% of all cases; and the five-level adjustment for possessing more than 600 images is added in 75% of all cases.  U.S. Sent'g Comm'n, *Use of Guidelines and Specific*

---

[3]    Report available online at https://www.ussc.gov/sites/ default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

*Offense Characteristics* pp. 98-99 (2024).[4]  (The total number of images in Aaron's possession – 2,165 – was comparatively modest: defendants nationally had a median 4,265 images in child pornography cases.  (Presentence Rep., R. 36 pg. 7 ¶ 29, Page ID # 153; *cf.* U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography Non-Production Offenses* pg. 30 Fig. 13 (2021).[5])

A prison term shorter than that prescribed by the Sentencing Guidelines will satisfy the goals of criminal punishment in Aaron's particular case.  The first of those goals, retribution, weighs significantly in any child pornography prosecution, and Aaron's conduct inescapably demands a punitive response from the court; however, "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender," *Tison v. Arizona*, 481 U.S. 137, 149 (1987), and Aaron's blameworthiness is meaningfully lessened by the fact that his own sexual trauma influenced his conduct.  Aaron's wrongdoing is not in any sense excused by his own victimization – as he himself emphasizes, "I now understand the psychological

---

[4]    Available online at https://www.ussc.gov/sites/default /files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2024/ Ch2_Guideline_FY24.pdf.

[5]    Available online at https://www.ussc.gov/research/ research-reports/federal-sentencing-child-pornography-non-production-offenses.

vulnerabilities that contributed to my behavior, but the responsibility for my actions is mine alone, and trauma does not excuse them." (Personal Statement, R. 40-2 pg. 9, Page ID # 193.) By this same token, though, Aaron's culpability is more akin to that of the pornography addict rather than the child predator, and the retribution rationale accordingly does not bear so heavily here as it might in some other cases.

The need to deter others from committing the defendant's crime similarly mandates a substantial penalty in Aaron's case, as it must in any child pornography case. But the readiness of judges to approve downward variances in similar prosecutions nationwide indicates a considered determination that the deterrence interest does not compel a prison term as long as that recommended by the Guidelines. It is not unreasonable to conclude that the average 56 month sentence imposed in comparable cases is as effective at deterring potential wrongdoers as the Guidelines minimum of 78 months; as one scholar has observed, "studies have failed to establish the validity of marginal deterrence: the claim that there is a link between higher penalties and the crime rate." Mirko Bagaric, *Consistency and Fairness in Sentencing – the Splendor of Fixed Penalties*, 2 Cal. Crim. L. Rev. 1, ¶35 (July 2000).[6]

---

[6]     Available online at https://www.bjcl.org/assets/files/2-Cal.-Crim.-L.-Rev.-1.pdf.

Aaron's diligent and successful effort in his counseling sessions to acquire the tools needed to avoid pornography use in the future goes far toward proving that the safety of the public does not call for Aaron to be incapacitated for a long period. That same consideration also suggests that Aaron's rehabilitation will be served by a shorter prison term and an earlier return to the community where he has done so well in his therapy.

* * * * *

"Nothing can undo the pain or damage I've caused," Aaron acknowledges. (Personal Statement, R. 40-2 pg. 11, Page ID # 195.) "What I can do," he vows, "and what I am committed to doing for the rest of my life, is remaining honest, transparent, and fully engaged in treatment so I continue to change the thinking that led me here." (*Ibid.*) "Everything I am learning only matters if I apply it consistently and humbly – so that nothing like this ever happens again. I can't erase my past, but I can use the lessons from it to make sure it never repeats." (*Ibid.*)

The defense asks the Court to impose a sentence below the Guidelines' recommendation in this case.

Respectfully submitted,

*Michael R. Mazzoli*

Scott C. Cox
Michael R. Mazzoli
Scott Coleman Cox, II
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MMazzoli@CoxAndMazzoli.com

*Matthew R. Lemme*

Matthew R. Lemme
LEMME LAW OFFICES, LLC
A.E. Hancock Building
413 W. First Street
New Albany, Indiana  47150
(812) 944-1234
Fax: (812) 944-8121
attorney@indiana.usa.com

Attorneys for the Defendant

## CERTIFICATE OF SERVICE

On November 26, 2025, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli